**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

| | | |
|---|---|---|
| **COREY TARVIN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1: 18-cv-00025** |
| | ) | **District Judge Richardson** |
| **CORRECTIONS CORPORATION** | ) | **Magistrate Judge Frensley** |
| **OF AMERICA d/b/a CORECIVIC,** | ) | |
| **et al.,** | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This pro se 42 U.S.C. § 1983 action is before the court on remaining defendants CoreCivic and the Tennessee Department of Corrections' motions for summary judgment. Docket Nos. 280, 286. The motions are briefed and ready for disposition. After reviewing the record and the briefs, the undersigned recommends that the motions for summary judgment be **GRANTED,** and the action be dismissed.

## I.    BACKGROUND

Plaintiff Corey Tarvin is a Tennessee inmate who is legally blind due to macular degeneration. He filed this action in May 2018, following events that occurred on October 23, 2017, and thereafter while he was housed at South Central Correctional Facility ("South Central" or "SCCF"), a prison operated by CoreCivic that houses prisoners in the custody of the Tennessee Department of Corrections ("TDOC"). Tarvin named as defendants CoreCivic, officers Matthew Corkum, Chris Jackson, unnamed Simmons, John Does #1 and #2, and Shawn Phillips, Warden of Bledsoe County Correctional Complex ("BCCX") where Tarvin is currently housed.

Tarvin alleges the following in his Third Amended Complaint ("TAC"). Docket No. 224. On October 23, 2017, while housed in the Apollo-B ("AB") pod at SCCF, Corkum was called to

the pod to "resolve a potential physical encounter" between Tarvin and his cellmate, who was a member of a Security Threat Group ("STG") whose members were targeting Tarvin. Id. at p. 6.

Later that day, Corkum returned to the AB pod to move Tarvin to the Gemini-A pod. Id. Tarvin alleges Corkum and CoreCivic failed to take reasonable measures to ensure that he would be protected from harm once he was moved to the new pod, specifically, that they failed to alert Shane McClain, Chief of Security, and Sgt. Inman that other STG members posed a serious threat to his safety. Id. He asserts defendants' failure to implement measures to protect him left him unprotected from further assault by STG members, and that the next day, the morning of October 24, 2017, "rival STG members threatened him with physical violence." Id. at p. 7.

Tarvin alleges officer McCoy witnessed the threats and immediately contacted other officers for backup. Id. Officers Jackson, Simmons, John Doe #1, and John Doe #2 responded to McCoy's request for assistance but left the Gemini-A pod without conducting an adequate investigation and after observing the situation for only a few minutes. Id. He alleges the other officers had by that time observed STG members threaten him with physical harm over a two-day period in two separate pods. Id. After the officers left the Gemini-A pod, multiple STG members began assaulting him by stabbing, kicking, and punching him. Id. Tarvin sustained multiple stab wounds and damage to his eye socket which required emergency surgery and other treatment. Id.

Tarvin alleges that Corkum knew or should have known that the other prisoner, his cellmate, posed a risk to his safety but failed to conduct an adequate investigation of the initial incident or resolve the serious threat that it posed to him. He alleges Corkum instead merely spoke with a member of the rival STG while investigating the "potential physical encounter" and left the pod. Id. He alleges the failures occurred despite video footage of the incident showing the threats of violence against him. Id. He alleges Corkum "failed to fully investigate the incident or to resolve

the serious threat it posed to [him.]" Id. He alleges Corkum knew or should have known that other prisoners posed a risk to his safety. Id.

Tarvin further asserts Corkum and Jackson were deliberately indifferent to his blindness, a serious medical need. Id. He alleges Corkum and Jackson "knew he faced a substantial risk of serious injury from other inmates and that he was particularly at risk due to his blindness, leaving him vulnerable and at risk of being unable to defend himself against imminent harm." Id. He asserts defendants are aware he is blind but have not provided him any services to allow to him communicate in writing. Id.

Tarvin asserts five counts in his TAC.[1] Count I asserts Corkum, Jackson, Simmons, and the John Does failed to protect him in violation of his Eighth Amendment Rights. Docket No. 224, pp. 16-17. In Count II, he asserts CoreCivic and the individual defendants were deliberately indifferent to his blindness in violation of his Eighth and Fourteenth Amendment rights. Id. at pp. 18-19. In Count III, he asserts CoreCivic and the TDOC have, by reason of his disability, excluded him from participation in and/or denied him the benefits of the services, programs, or activities of these public entities, and have subjected him to discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et seq.* Id., pp. 19-23. In Count IV, he asserts CoreCivic and the TDOC discriminated against him based on his disability in violation of the Rehabilitation Act. Id. at pp. 23-25. In Count V, he asserts CoreCivic and Phillips denied him access to the courts by interfering with his court mail and retaliating against him in violation of his First and Fourteenth Amendment rights. Id. pp. 25-27. He asserts allegations against TDOC outlining its current violations of his rights. Tarvin seeks, inter alia, damages and injunctive and

---

[1] Tarvin has been represented by court-appointed counsel throughout periods of this litigation, including the drafting and filing of the TAC. On August 13, 2024, the court granted counsel's motion to withdraw, Docket No. 250, and Tarvin is currently proceeding pro se.

declaratory relief. Id., at pp. 27-28.

The court dismissed (1) the failure-to-protect claims against Corkum and Jackson; (2) the deliberate-indifference-to-medical-needs claim against the CoreCivic defendants; (3) the Rehabilitation Act claim against CoreCivic; and (4) "Officer Simmons" and the John Doe defendants. Docket Nos. 270-71

CoreCivic, the TDOC, and Brett Cobble, current warden at BCCX, now move for summary judgment on all remaining claims. Docket Nos. 280, 286. CoreCivic argues Tarvin's claims are barred for failure to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA). Docket No. 287, p. 6. It argues Tarvin's failure to protect claim fails because Tarvin cannot prove the existence of any constitutional policy or failure to train that acted as the moving force for such a claim, Id. at p. 13, or that any of its officers violated his Eighth Amendment rights by failing to protect him. Id., at p. 16. CoreCivic contends Tarvin's claim that he was denied access to the courts fails based on his deposition testimony that he received meaningful access to the courts. Id. at p. 23. CoreCivic finally argues Tarvin's claim that CoreCivic hindered his ability to pursue legal claims and his ability to file grievances in retaliation for filing a lawsuit fails because the evidence demonstrates defendants took no adverse action against him and Tarvin himself testified that his access to the court was never hindered and that he was able to file grievances at all times. Id. at pp. 24-25. In support of its motion, CoreCivic submitted excerpts of Tarvin's deposition, copies of Tarvin's grievances, and the sworn declarations of Cynthia Nunnally, grievance chairperson at HCCF; Melissa Strawn, grievance chairperson at SCCF; and Grady Perry, current warden at SCCF. Docket Nos. 286-2, 286-3, 286-4 and 286-5.

In their motion, TDOC and Cobble also argue Tarvin failed to exhaust. Docket No. 280, p. 1. They argue Tarvin failed to exhaust his ADA and Rehabilitation Act claims because he failed

to exhaust any health-related grievance against TDOC until April 30, 2024, after he filed his TAC. Id. They contend Tarvin's claim that he was denied access to the courts fails because he failed to exhaust any grievances against TDOC or the BCCX Warden related to his ability to pursue claims in court or access his attorneys. Id. They argue Tarvin's ADA and Rehabilitation Act claims fail because the evidence demonstrates they have properly accommodated him. Id. They argue Tarvin's claim that he was denied access to the courts fails based on his testimony that he has always been able to file documents in court either by himself or with the help of others. Id. In support of their motion, TDOC submitted excerpts of Tarvin's deposition, copies of grievances, as well as the declarations of Brett Cobble, current Warden at BCCX; Benjamin Bean, Correctional Program Manager at TDOC; and Mandy Richardson, Associate Warden of Treatment at DeBerry Special Needs Facility. Docket No. 280-1, 280-2, 280-3 and 280-4.

Tarvin responded, opposing the motions, submitting two unsworn statements which Tarvin describes as "affidavits." Docket Nos. 289 and 290. The statements are not notarized, nor do they contain the necessary language to qualify as a declaration under 28 U.S.C. § 1746. Tarvin did not respond to defendants' statements of undisputed facts. TDOC and Cobble filed a reply. Docket No. 291. The evidence proffered by defendants reveals the following.

A.    CoreCivic

On October 23, 2017, Tarvin was housed in AB pod at SCCF. Docket No. 286-1, p. 1. While in AB pod, Tarvin had the same cellmate for approximately two to three weeks without issue. Id. at p. 2. He did not know whether his cellmate was gang-affiliated. Id. at p. 3. One day Tarvin was getting down from his bunk bed when he knocked over an unknown item that belonged to his cellmate. Id. at p. 3. In response, Tarvin's cellmate told him that he had to pay him ten dollars to replace the presumably broken item or to move out of the cell. Id. at p. 4. Because he was

planning on going to the shower, Tarvin brushed off his cellmate's demand. Docket No. 286-2, p. 7. Later that day several inmates approached Corkum and told him that Tarvin should be moved. Docket No. 286-1, p. 4. Apparently based on this conversation, Corkum decided to move Tarvin to GA pod. Id. at p. 5. Tarvin testified at his deposition that on his way to GA pod, he informed Corkum that he was in fear of his life and wanted to be placed in protective custody. Docket No. 286-2, at p. 9. Tarvin did not describe any specific threats, however. Id. Tarvin testified that Corkum responded that Tarvin would still move to the other pod and that he would "try to work something out" for him the following day. Id. Tarvin was moved to the GA pod and away from his previous cellmate around 8:30 p.m. that night. Docket No. 286-2, p. 12. He had no issues that night. Id. at pp. 12-13.

The next morning several unknown inmates surrounded Tarvin while he was in the dayroom and informed him that they did not want him to live in their pod. Id. at p. 14, 17. Other than telling Tarvin to leave the pod, the inmates did not otherwise threaten him. Id. at p. 25. Tarvin testified that he did not know the inmates, did not know whether they were gang affiliated, and did not know whether their assertion that they wanted him out of the pod was in any way related to the incident the day before. Id. at pp. 17-18, 25. According to Tarvin, officer McCoy witnessed inmates congregating around Tarvin and called a code. Id. at pp. 14, 18. However, the inmates had already dispersed by the time the officers arrived. Id. Tarvin did not speak to any of the officers while they were in the pod. Id. at pp. 19-20

Later that morning, officer Edwards had Tarvin moved from his second-floor cell to a bottom floor cell due to his disability. Id. at p. 15. Tarvin did not express any concern for his safety to Edwards. Id. at pp. 15, 21. Tarvin then went to his new cell to see whether the previous occupant was in the process of moving, and upon arriving, observed a group of inmates he did not know. Id.

6

at pp. 15-16, 24-25. He asked the inmates whether the inmate assigned to the cell was ready to move to free a bed for him, and an inmate told him to give him a "few minutes." Id. at p. 22. Tarvin then attempted to leave the cell. Id. at p. 23. As he walked away an inmate hit him in the head from behind. Id. The group of inmates then assaulted him. Id. Officer McCoy observed Tarvin after the assault and called a code. Id. at p. 26. Tarvin was airlifted to the hospital where he was treated. Id. at p. 27.

Following the assault, Tarvin returned to SCCF and was placed in protective custody. Id. at p. 29. During his time in protective custody, Tarvin was able to file grievances. Id. at pp. 30-32. On September 12, 2018, he was transferred to HCCF. Docket No. 286-5, p. 5. While at SCCF and HCCF, Tarvin was able to file a lawsuit if he desired, draft letters or court filings or have another inmate do it for him, and send and receive mail without issue. Docket No. 286-2, pp. 31-32. Tarvin also had no issues concerning access to his counsel while at HCCF or SCCF. Id. at pp. 32-35. He had several phone and video calls with counsel and met with counsel in person on one occasion. Id. at p. 34. Tarvin testified that he has been "able to voice [his] … opinion and [his] story" to the court. Id. at p. 37.

## B.     Tennessee Department of Corrections  (TDOC)

From 2017-2018, Tarvin was housed at South Central Correctional Facility. Docket No. 224, p. 3. From 2018 to April 2022, he was housed at Hardeman County Correctional Complex ("HCCF"), another CoreCivic facility. Id. Since April 2022, Tarvin has been housed in TDOC facilities; he is currently housed at Bledsoe County Correctional Complex ("BCCX,") where he has been since January 2023. Id. at p. 3. From April 20 to September 26, 2022, Tarvin was housed at DeBerry Special Needs Facility ("DSNF" or "DeBerry"), a medical and housing facility for inmates with ongoing medical and/or mental health needs. Docket No. 224, p. 3. Although Tarvin

is blind, he does not have a medical or mental health issue that requires ongoing medical treatment. Docket No. 280-4, p. 1. Tarvin's blindness does not require medical intervention, only accommodations that any TDOC facility could provide. Id. While Tarvin was housed at DeBerry, equipment was ordered for him that it did not already have. Id.

1. **Tarvin's Relevant Grievances**

Tarvin has filed 37 grievances since 2007 when he began serving his current sentence, Docket No. 280-2, p. 4. Tarvin testified at his deposition that he has never been unable to file a grievance. Docket No. 280-1, p. 15. He has either written them himself or with assistance from an inmate helper. Id. at p. 14.

Benjamin Bean, Correctional Program Manager for TDOC, is familiar with the grievance process and responds to grievances that have reached Level III, the final level of appeal. Docket No, 280-3, pp. 1-2. A grievance begins at Level 1 when the inmate files the grievance. Id., at p. 1. After the grievance is logged into TDOC's system, the supervisor of the employee who was the subject of the grievance provides a response to the grievance committee chairperson at the prison where the inmate is housed. Id. The grievance committee chairperson reviews the supervisor's response and writes the chairperson's response. Id. If the inmate does not direct the grievance at any one person, the grievance is directed to the grievance committee chairperson for a response. Id. If the inmate does not agree with the chairperson's response the inmate can file an appeal to the grievance committee at Level II. Id. The grievance committee conducts a hearing, which includes the inmate as part of the process, and issues a decision. Id. The grievance committee's decision is then sent to the warden for consideration and the warden then issues his decision. Id. If the inmate does not agree with the warden's decision, he can appeal to the Assistant Commissioner at Level III. Id., at p. 2. A Level III decision is final and not appealable. Id. Unless

an inmate appeals, a grievance can be resolved at any level. Id.

Tarvin filed the following grievances, all of which he described as Title VI grievances. Docket No. 286-1, p. 30.  On November 17, 2017, Tarvin filed his first health-related grievance, no. 321056, complaining that South Central had no special forms, books, or computers for the visually impaired, and resultingly, he was not able to participate in various programs, including sick call, medical, religious, and legal services, grievance, or commissary. Docket No. 280-3, p. 2. He sought transfer to DeBerry Special Needs Facility. Id. The grievance was completed at Level III on February 9, 2018.  Id.

On July 26, 2020, Tarvin filed grievance no. 343369 while housed at HCCF, complaining that the facility had no special forms for the visually impaired and that he was unable to properly function as a result. Docket No. 280-3, p. 2.  The grievance was resolved at Level III on November 9, 2020. Id.

On November 2, 2020, while housed at HCCF, Tarvin filed grievance no. 345225, complaining that he had been unable to obtain treatment for his eye disease. Id. That grievance was resolved at Level III on December 14, 2020. Id.

On November 19, 2020, while housed at HCCF, Tarvin filed grievance no. 345516, complaining that he was not being medically treated, that he could not participate in his criminal appeal procedures, and that he was not being properly secured. Id.  That grievance was resolved at Level III on January 19, 2021. Id., pp. 2-3.

On January 10, 2021, while housed at HCCF, Tarvin filed grievance no. 346346, claiming that he was being retaliated against for a past grievance and being denied medical treatment. Id., p. 3.  That grievance was resolved at Level III on March 9, 2021. Id.

 On March 28, 2024, while housed at BCCX, Tarvin filed grievance no. 365008 requesting

to be sent to DeBerry, asserting that it is where other blind inmates were housed and where special programs are offered for them. Id. That grievance was resolved at Level III on April 30, 2024. Id. Tarvin has not filed any other health-related grievances since April 30, 2024. Id.

Tarvin has not filed any grievances asserting that defendants limited his access to counsel, eavesdropped on phone calls with counsel, limited his access to Westlaw, or denied him any accommodation that would limit his access to the court system. Docket No. 280-2, p. 5. Nor has he filed any grievances asserting failure to provide assistive technology, inability to file grievances, failure to provide assistance in translating correspondence and documents sent to him, inability to file for medical services, inability to order commissary, dislike of the shower situation, lack of access to his attorneys, or failure to give him his mail. Id.

### 2. Accommodations Provided to Tarvin from July 2021- Present

From July 2021 through January 2023, while housed at Northwest Correctional Complex ("NWCX"), Tarvin was provided with a magnifying glass to keep in his cell and had access to the optical character recognition ("OCR") machine in the library. Docket No. 280-2, pp. 2-3. Staff at NWCX provided him with training on operating the equipment and noted that he was able to power up the machine and use it appropriately. Id. at p. 2.

Tarvin is currently housed at BCCX where, at his request, he is housed in a ground level, first-floor, handicap cell with no roommate, and where he is able to navigate his unit and the facility without assistance.[2] Id. However, he has been placed in disciplinary and/or administrative segregation for over a year because he has repeatedly refused his cell assignment and insisted he be housed at DeBerry and that he needs protective housing. Id. Tarvin has a single cell to himself,

---

[2] Attached to Brett Cobble's Declaration are several videos that show Tarvin walking without assistance and with a cane. Id.

including private showers, while in disciplinary and/or administrative segregation. Id.

BCCX has two OCR readers with text-to-speech capability. Id., at p. 3. BCCX has also ordered electronic books for Tarvin which are in the library. Id. He has an electronic Bible. Id. BCCX also has computers with speech-to-text and text-to-speech capabilities. Id. Tarvin also now has a personal tablet with text-to-speech and speech-to-text capabilities to assist him in reading books and other materials. Id. He can order paper and e-books; access games, videos, and television programs; engage in educational programming and approved classes such as parenting or life skills classes; watch approved television programs and movies; play approved games such as Sudoku and crossword puzzles; order commissary; access grievance and medical forms; access telemedicine; access Westlaw for legal research; access text and audio books, including any Bible, Quran, or other religious texts available online; correspond electronically with people who are on his visitation, phone, and attorney lists. Id. Brett Cobble attested in his declaration that TDOC has committed to not deprive Tarvin of these tablets as a disciplinary measure and that he is able to keep his tablet with him at all times even while on disciplinary segregation. Id.

Tarvin currently has Westlaw access in the library and an inmate helper to assist with research. Id., p. 3. No inmate is permitted to access Westlaw without an inmate helper who is specifically trained for Westlaw and who will operate the computer. Id. BCCX also provides inmate legal helpers to assist with filling out forms, such as grievances, commissary, and medical forms. Id. at p. 4. The inmate legal helpers also assist with disciplinary hearings and other legal matters. Id. Tarvin has equal access to these inmate helpers. Id.

TDOC is in compliance with Tarvin's Health Classification Summary; it houses him in a first-floor, single-cell unit with a bottom bunk and provides him with a cane and special footwear. Id. at p. 4. Tarvin is eligible to participate in any educational and life skills programs that is

available to inmates at BCCX just like any other inmate. Id. at p. 3.  Although Tarvin has not asked to participate in any programs, BCCX would provide him an inmate helper to assist him in his classwork and any other needs he may have pertaining to the program. Id.

When Tarvin is at his assigned site, he has the capability to conduct private video meetings with his attorneys via Zoom with no one else present in the room. Id. at p. 4.  Although there is a window that looks into the room for a staff member to monitor the website being used from outside the room, the staff member cannot hear what is being said.  Id.  An agreement was reached with Tarvin's former counsel to allow him to be escorted to a safe site where he can communicate with counsel on Zoom calls with no one present in the room while he is in administrative or disciplinary segregation, a resolution which was satisfactory to Tarvin and his counsel at the time. Id.

Tarvin testified to the following at his deposition.  Docket No. 280-1. He has had assistance from inmate helpers since 2018. Id., at pp. 5-6. The helpers assist him with grievances, commissary, and filing court documents. Id., at pp. 7-9. The helpers who assist him with court filings are knowledgeable about the law in general.  Id. at p. 9.  He has never not been able to file a grievance. Id. at p. 15.  He has always been able to file his own handwritten documents or others with the assistance of an inmate helper. Docket No. 286-2, p. 3. There are inmates available to assist him in the library. Docket No. 280-1, p. 29. He has always received his mail. Docket No. 286-2, p. 45-46.  TDOC has always provided him with a job of some kind. Docket No. 280-1, p. 33.  He can walk and get around. Docket No. 280-2, pp. 1-2.  He has an excellent memory and can learn a new area or location quickly. Docket No. 280-1, pp. 3-4.

Mandy Richardson, Associate Warden of Treatment at DSNF, attested in her declaration that Tarvin does not have a medical or mental health issue that requires ongoing medical treatment. Docket No. 280-4, p. 1.  She attested that Tarvin's impairment does not require medical

intervention, but only requires accommodations that any TDOC facility could provide. Id.  When Tarvin was housed at DeBerry in 2022, the facility ordered the equipment that the ophthalmologist recommended for him; DeBerry did not already have that equipment, and the equipment stayed there.  Id.  It is not unusual for a facility to need to order new equipment when the facility gets a new disabled inmate. Id., at p. 2.  DSNF offers fewer programs than other facilities. Id. Richardson attested that if Tarvin were to be housed at DeBerry he would not have any more accommodations than would be provided at any other facility and he would not have access to many of the programs that other facilities provide. Id.

Cynthia Nunnally, grievance chairman at HCCF, attested to the following in her declaration.  From September 12, 2018, to April 31, 2019, Tarvin submitted a total of two grievances at HCCF, both of which were Title VI grievances. Docket No. 286-3, pp. 3-4 and exhibits attached thereto.  He did not file any grievances concerning the October 23 or October 24, 2017, altercations at SCCF. Id at p. 4. Tarvin did not file any grievances alleging that HCCF staff in any way impeded his ability to file a lawsuit, to submit any court filings, to speak with or meet with his attorneys, or breached his attorney-client privilege. Id. Further, Tarvin did not submit any grievance alleging that staff at HCCF denied him the ability to file grievances, failed to deliver any legal mail, or in any way retaliated against him for filing a lawsuit.  Id.

Melissa Strawn, grievance chairperson at SCCF, attested to the following. Docket No. 286-4 and exhibits attached thereto. Tarvin submitted a total of three grievances at SCCF from January 1, 2017, to September 12, 2018, when he transferred to HCCF, (Id. at p. 3), all labeled as grievances filed pursuant to Title VI of the Civil Rights Act. In the first, filed November 17, 2017, Tarvin alleged that SCCF lacked specific materials for visually impaired inmates and that the lack of materials was a result of discrimination.  Id. at p. 4. In the second, filed January 19, 2018, Tarvin

13

complained about a disciplinary board proceeding, which he deemed "biased, unprofessional and unfair." Id. He also complained that he was "discriminated against." Id. On August 6, 2018, Tarvin filed a third grievance alleging that a correctional officer racially discriminated against him by hitting his door and shining a flashlight in his eyes. Id. It was ultimately determined that none of Tarvin's grievances supported a violation under Title VI. Id.

Tarvin filed no other grievances while at SCCF during the aforementioned period. Id. at p. 5. Nor did he file any grievances concerning the October 23 or October 24, 2017, altercations. Id. Strawn attested that Tarvin did not file any grievances alleging that SCCF staff in any way impeded his ability to file a lawsuit, to submit any filings to a court, to speak or meet with his attorneys, or breached his attorney-client privilege. Id. Further, Tarvin did not submit any grievance alleging that SCCF staff denied him the ability to file grievances, failed to deliver any legal mail, or in any way retaliated against him for filing a lawsuit. Id.

Grady Perry, current warden at South Central and former warden at HCCF, attested to the following. Docket No. 286-5. Per CoreCivic policy, SCCF strictly prohibits gang activity, punishes inmates found to be engaged in gang-related activity, and protects inmates from gang-related violence. Id. p. 2. Additionally, SCCF employs a Security Threat Group (STG) coordinator who is responsible for monitoring gang or STG activity within SCCF, gathering information on gangs within the facility, and transmitting the information and gang intelligence to the TDOC. Id. SCCF officers are also required to initiate disciplinary proceedings against any inmates found to be engaged in extortion or any other STG or gang-related activity and includes removing perpetrators from the general population. Id. at p. 3; 286-1. P. 18. CoreCivic officers are further trained to prevent and report STG activity. Id. at p. 5.

CoreCivic ensures inmates are protected from harm by offering protective services. Id. at

pp. 1-2. If an officer receives information indicating that an inmate may be in danger of harm from other inmates, the officer initiates the protective custody process. Id. While the investigation into the potential danger is pending, the inmate is kept separate from the general population. Id. Should the information ultimately be substantiated, TDOC policy provides multiple remedies to ensure the inmate's protection. Id. In accordance with the above, all SCCF officers are trained on TDOC policy and trained to take immediate steps to protect an inmate when they receive information that the inmate's health or safety is in danger, including after an officer observes a threat to an inmate and needs an assistance code. Id. at p. 5.

## II.     LAW AND ANALYSIS

### A.     Legal Standard

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party bringing the motion has the burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute of material facts. *Rodgers v. Banks*, 344 F. 3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.* A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Van Gorder v. Grand Trunk Western Railroad,*

*Inc.*, 509 F. 3d 265, 268 (6th Cir. 2007). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249. The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to allow the nonmoving party's claims to survive summary judgment; rather, the nonmoving party must convince the Court that there is sufficient evidence for a juror to return a verdict in its favor. *Id.*

Generally, the Court liberally construes pro se pleadings, holding them to less stringent standards than those drafted by lawyers. *See Williams v. Curtin*, 631 F. 3d 380, 383 (6th Cir. 2011) (internal quotation marks and citation omitted) (addressing pro se complaints). Nevertheless, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure. *Wells v. Brown*, 891 F. 2d 591, 594 (6th Cir. 1989).

### B.      Analysis of Plaintiff's Claims

Count I, Tarvin's failure-to-protect claim remains pending as to CoreCivic. Counts III and IV, Tarvin's claims under the ADA and the Rehabilitation Act, remain pending against both defendants. Count V, Tarvin's claim asserting that he was denied access to the courts by interfering with his court mail and retaliating against him in violation of his First and Fourteenth Amendment Rights remains pending against CoreCivic.

### 1.      Failure to Exhaust

Defendants first argue Tarvin failed to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA) because he never filed a grievance concerning the allegations in his TAC. Docket No. 287, at pp. 8-11. The undersigned agrees.

Congress enacted the PLRA to "reduce the quantity and improve the quality of prisoner

suits" that were flooding federal district courts nationwide and to reduce the need for federal courts to intervene in prison management. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Freeman v. Francis*, 196 F. 3d 641, 644 (6th Cir. 1999). To help achieve these objectives, the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This mandatory exhaustion requirement acts as a gatekeeper and is intended "to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." *Reed-Bey v. Pramstaller*, 603 F. 3d 322, 324 (6th Cir. 2010) (citing *Woodford v. Ngo*, 548 U.S. 81, 94-95 (2006)). Moreover, the term "prison conditions" in § 1997e(a) is broad and includes claims of excessive force. *Freeman*, 196 F. 3d at 644.

The PLRA does not provide a uniform federal exhaustion standard; rather, the inmate's correctional institution defines the applicable procedural rules that the inmate must follow to exhaust his administrative remedies. *Jones v. Bock,* 549 U.S. 199, 218 (2007). Thus, to comply with the PLRA's exhaustion requirement, an inmate must take "advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey*, 603 F. 3d at 324 (citing *Woodford*, 548 U.S. at 90, 95).

Here, Tarvin failed to exhaust because he did not file any grievance asserting the allegations in his TAC. Although Tarvin filed the five grievances detailed above during the relevant time at HCCF and SCCF, (Docket No. 286-1, p. 30), none of the grievances assert

CoreCivic or its employees failed to protect him; prevented him from accessing this Court; eavesdropped on attorney-client communications; or retaliated against him for filing a lawsuit. Nor do they assert any other allegations for remaining claims in his TAC. Tarvin's grievances do not satisfy the PLRA because they do not address the claims asserted in his TAC. Accordingly, Tarvin has failed to exhaust.

The grievances also do not satisfy the PLRA because they assert only Title VI allegations. The TDOC has implemented a separate and distinct procedure for inmates to make complaints that Title VI of the Civil Rights Act of 1964 has been violated.[3] Because the Title VI grievance procedure remains entirely separate from the normal grievance procedure and addresses allegations only in relation to Title VI, a Title VI grievance is insufficient to grieve a § 1983 claim. *See Perkins v. S.C.C.F. Core Civic*, 2023 WL 4748238, at *6 (M.D. Tenn. July 24, 2023) report and recommendation adopted by 2023 WL 4748238 (M.D. Tenn., Sept. 11, 2023).

Tarvin's grievances were labeled as Title VI grievances, and therefore were not submitted under the normal grievance procedure. Because Tarvin employed the Title VI procedure, the scope of review for his grievances concerned only his allegations the named individuals discriminated against him based on his race, color, or national origin. Because CoreCivic was not provided the opportunity to address the allegations in this suit, the undersigned concludes Tarvin has failed to exhaust administrative remedies as required by the PLRA.

## 2. Count I - Failure-to-Protect

Tarvin's claim that CoreCivic failed to protect him also fails on the merits. To find a prison

---

[3] Applicable TDOC grievance procedures are set out in TDOC Policy #501.01 (Inmate Grievance Procedures) and TDOC Policy #103.10 (Title VI – Civil Rights Act of 1964). See Tennessee Department of Correction website, https://www.tn.gov/correction/about-us/policies-and-procedures.html; Fed. R. Evid. 201(b) (permitting judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

official liable for a failure-to-protect claim under the Eighth Amendment, two requirements must be met. First, the plaintiff must demonstrate that his mistreatment was objectively "sufficiently serious." *Bishop v. Hackel*, 636 F. 3d 757, 766 (6th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the plaintiff must establish that the prison official acted with deliberate indifference to the inmate's safety. *Id.* An official is deliberately indifferent if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837. The Supreme Court has stated:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Id. at 842. However, a prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it.

*See Id*. at 842-43.

A governmental entity cannot be found liable due to an employee's or agent's actions under a respondeat superior analysis. *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 694 (1978). Instead, a government entity can be found liable under § 1983 only where the entity itself causes the constitutional violation at issue. *Id.* Accordingly, to prevail on a § 1983 claim against a governmental entity, a plaintiff must show that a policy or well-settled custom of the entity was the "moving force" behind the alleged deprivation of his or her rights. *Miller v. Sanilac Cnty*, 606 F. 3d 240, 254-55 (6th Cir. 2010).

To satisfy Monell's requirements, a plaintiff must "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F. 3d 358, 364 (6th Cir. 1993). This is

essentially a causation inquiry, requiring the plaintiff to show that it was the defendant's custom or policy that led to the complained of injury. *Id*. at 363-64.

There are several ways a plaintiff can prove the existence of an illegal policy or custom: (1) legislative enactments or official agency policies; (2) decisions made by policymakers with final decision-making authority; (3) constitutionally inadequate training or supervision; (4) and a custom of constitutional rights violations. *Thomas v. City of Chattanooga*, 398 F. 3d 426, 429 (6th Cir. 2005).

Tarvin alleges a failure to train or supervise theory of liability, specifically that CoreCivic failed to train or supervise its officers in (1) handling incidents involving STG members; (2) permitting undocumented or unscreened STG cell assignments; and (3) permitting "officers to clear codes without conducting an adequate investigation." Docket No. 224, p. 17.

The Supreme Court has stated that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-88 (1989) (inadequacy of police training is a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact). To establish a failure-to-train claim, a plaintiff must show that the defendant had notice its procedures were inadequate and likely to result in a violation of constitutional rights. *See id.* at 396 (O'Connor, J., concurring). Notice may be implied where failure to train officers is so likely to result in a violation of constitutional rights that the need for training is patently obvious. *City of Canton,* 489 U.S. at 390, n. 10. A failure to train claim may also arise from a pattern of constitutional violations which put the government on notice that its employees' responses to a regularly recurring situation are insufficient to protect the constitutional rights of its citizens. *Id.* at 397 (O'Connor, J., concurring).

To succeed on a failure-to-train or supervise claim, a plaintiff must prove that (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the government entity's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F. 3d 690, 700 (6th Cir. 2006).

As an initial matter, there is no record evidence that the incidents that occurred on October 23 and October 24, 2017, involved STG or gang members. Tarvin testified that he is not gang-affiliated; that he did not know whether his cellmate on October 23 before he was transferred to another pod was gang-affiliated; that he did not know whether the inmates that surrounded him were gang-affiliated; and that he did not know the identities of the inmates who assaulted him. Docket No. 286-2, pp. 5-6, 17-18, and 25. Therefore, even if he could establish that CoreCivic failed to properly train officers on handling STG incidents or STG cell assignments, the evidence shows Tarvin's asserted claims against CoreCivic were not the impetus behind the October 24, 2017 assault.

Conversely, CoreCivic presented evidence that it strived to combat and prevent STG and gang-related activity at all times relevant to this action. Per CoreCivic policy, SCCF strictly prohibits gang activity, punishes inmates found to be engaged in gang-related activity, and protects inmates from gang-related violence. Docket No. 286-5, pp. 2-3. Additionally, SCCF employs a STG coordinator who is responsible for monitoring gang or STG activity within SCCF, gathering information on gangs within the facility, and transmitting the information and gang intelligence to the TDOC. Id. SCCF officers are also required to initiate disciplinary proceedings against any inmates found to be engaged in extortion or any other STG or gang-related activity and includes removing perpetrators from the general population. Id. p. 2-3, 286-1, p. 18. CoreCivic officers are further trained to prevent and report STG activity. Id. at p. 2.

As for Tarvin's claim that CoreCivic failed to train officers to conduct an adequate investigation before clearing an officer's "needs assistance" code, the evidence demonstrates that CoreCivic's policies and training were adequate. CoreCivic ensures inmates are protected from harm by offering protective services. Docket No. 286-5, pp. 1-2 . If an officer receives information indicating that an inmate may be in danger of harm from other inmates, the officer initiates the protective custody process. Id. While the investigation into the potential danger is pending, the inmate is kept separate from the general population. Id. Should the information ultimately be substantiated, TDOC policy provides multiple remedies to ensure the inmate's protection. Id.  In accordance with the above, all SCCF officers are trained on TDOC policy and trained to take immediate steps to protect an inmate when they receive information that the inmate's health or safety is in danger, including after an officer observes a threat to an inmate and needs an assistance code. Id. p. 5.

On this record, the undersigned concludes Tarvin cannot prove that CoreCivic in any way maintained unconstitutional insufficient policies or offered training that was  inadequate.  Nor can Tarvin show that any CoreCivic officer failed to protect him in violation of the Eighth Amendment. "To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. The risk to inmate health or safety must be "excessive." *Id.* 511 U.S. at 837. The objective prong "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). The analysis must consider the likelihood of harm to the injured party in the context of the circumstances that led to the injury. *See Reedy v. West*, 988 F. 3d 907, 909, 912-14 (6th Cir. 2021)(granting summary judgment to

defendant); *see also Schack v. City of Taylor*, 177 F. App'x 469, 472 (6th Cir. 2006). In other words, a failure-to-protect claimant cannot state an objectively excessive risk of harm by merely alleging facts of physical harm that occurred *following* the violation. *Caraway v. CoreCivic of Tenn., LLC, et al.*, 98 F. 4th 679, 685 (6th Cir. 2024)(emphasis added). Even where a serious injury occurs, the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party *before* the alleged injury occurred." *Zakora v. Chrisman (In re Est. of Zakora)*, 44 F. 4th 452, 469 (6th Cir. 2022) (emphasis added). The relevant constitutional "injury" is the exposure to an objectively excessive risk, "not any physical harm that befalls the inmate because of that risk." *Caraway*, 98 F. 4th at 685. It is not enough to simply state that the causation requirement is satisfied; that legal conclusion must be supported by "'[s]ome factual basis' showing a causal link.'" *Id.*, 98 F. 4th at 686.

Because the court dismissed the individual defendant officers who allegedly failed to protect Tarvin because he could not establish the objective prong, Docket Nos. 270-71, it follows that the claims against CoreCivic should also be dismissed. *See Couzens v. City of Forest Park*, 114 F. 4th 571, 580 (6th Cir. 2024).

The evidence however also establishes Tarvin did not face an objective risk of harm. Tarvin testified that his cellmate on October 23, 2017, told him that he needed to replace an item he broke or move out of the cell. Docket No. 286-2, p. 6. Tarvin did not report the incident and "brushed it off" because he was headed to the shower. Id. at p. 7. Later that day several inmates approached officer Corkum and requested Tarvin be moved. Id. Tarvin testified that he "kind of feared for his life" and asked Corkum to be put in protective custody. Id. pp. 9-10. He testified further that no physical altercation occurred and that it was "just a bunch of words." Id. at p. 8. This evidence demonstrates Tarvin did not face an "excessive" risk of harm on October 23, 2017.

*Cf. Reedy v. West*, 988 F. 3d 907, 909, 912-14 (6th Cir. 2021) (although the plaintiff had suffered a "brutal assault" at the hands of his cellmate, the objective prong was not met because general disagreements between the cellmates before the incident did not present a substantial risk of harm). Moreover, Corkum acted to curtail any risk of harm by transferring Tarvin to another pod. Tarvin presented no other evidence to support his fear and testified that he was never threatened with violence. Docket No. 286-2, p. 9.

Tarvin fails to present evidence to satisfy the subjective prong, too. Tarvin's general concern that he was in fear of his life--without more--would not make Corkum subjectively aware of a substantial risk of harm. *Cf. Perry v. Warden Warren Corr. Inst.*, No. 1:20-CV-30, 2022 WL 3369662, at *11 (S.D. Ohio Aug. 16, 2022), R&R adopted, No. 1:20-CV-00030, 2022 WL 4493913 (S.D. Ohio Sept. 28, 2022) (a plaintiff must do more than allege a generalized concern for his safety and welfare).

Tarvin also fails to prove that he faced an objectively serious risk of harm on October 24, 2017, or that any CoreCivic officers were deliberately indifferent to any known threats on that date. The group of unidentified inmates that approached Tarvin on October 24 stated only that he could not live in the pod, not that they intended to assault him. Docket No. 286-1, p. 7. Although officers entered the pod, Tarvin did not report this conversation to them. Docket No. 286-2, p. 20-21. Tarvin was subsequently attacked later that day without warning. Id. p. 23.

On this record, specifically, the lack of threats to Tarvin, Tarvin's failure to report to any officer concerns for his safety, and the unforeseeable nature of the assault, the undersigned concludes Tarvin fails to establish a genuine dispute as to any material fact on this claim. His failure-to-protect claim therefore fails as a matter of law.

### 3. Counts III and IV – ADA / Rehabilitation Act

In Counts III and IV, Tarvin alleges the TDOC discriminated against him based on his disability in violation of the ADA and the Rehabilitation Act. Docket No. 224, at pp. 23-25. The TDOC contends these claims should be dismissed for failure to exhaust. Docket No. 280-3, p. 3. The undersigned agrees.

It is undisputed that Tarvin filed a grievance against TDOC on March 28, 2024, asking to be transferred to DeBerry, and that it was resolved on April 30, 2024. Docket No. 280-3, p. 3. The TAC was filed on April 16, 2024, before the grievance was exhausted. Tarvin therefore failed to exhaust the grievance process prior to the filing of the operative complaint.

These claims also fail on the merits. Courts generally interpret claims under Title II of the ADA and the Rehabilitation Act together because they are functionally the same. *Bennett v. Hurley Medical Center*, 86 F. 4th 314, 323-24 (6th Cir. 2023). Plaintiffs may allege disability discrimination under two potential theories: (1) intentional discrimination and (2) failure to reasonably accommodate. *Bennett*, 86 F. 4th at 326. Tarvin alleges the latter. The ADA and the Rehabilitation Act do not require that a plaintiff receive his "preferred" accommodation, but rather a reasonable one that provides "meaningful access" to the entity and the programs, services, and activities. *Bennett*, 86 F. 4th at 326. A reasonable accommodation need not be "perfect." *Keller v. 14 Chippewa County, Michigan Board of Commissioners*, 860 Fed, Appx. 381, 386 (6th Cir. 2021) (citation omitted).

The evidence demonstrates TDOC has reasonably accommodated Tarvin. Tarvin has had access to inmate helpers since 2018. Docket No. 280-1, p. 6. These inmate helpers can help him with a wide variety of things – grievances, court filings, Westlaw legal research, medical forms, commissary, disciplinary hearings, assistance in navigating his unit and other places, educational

and other programs, reading his mail, and other needs he may have. Docket No. 280-2, p. 4. The personal tablet that Tarvin has now provides the capability for him to do those things from his tablet – with speech-to-text and text-to-speech capability. Docket No. 280-2, p. 3. Tarvin testified that he has always had some sort of job. Docket No. 280-1, at pp. 33-34.  He has a magnifying glass in his cell, access to OCR readers that have text-to-speech capabilities, computers that have text-to-speech and speech-to text capabilities, and now a personal tablet which has text-to-speech and speech-to-text capabilities. Docket No. 280-2, at pp. 3-4.  Tarvin has always had the ability to sign up for educational and life skills programs and now has that capability on his personal tablet. Id.

Tarvin testified that he has never not been able to file a grievance. Docket No. 286-2, p. 31-32.  He has always been able to file his own handwritten documents or others with the assistance of an inmate helper. Id. at p. 44.  There are inmates available to assist him in the library. Docket No. 280-2, p. 3, Docket No. 280-1, p. 29.  He has always received his mail. Docket No. 286-2. at p. 44-46.  He can walk and get around. Docket No. 280-2, pp. 1-2.  He has an excellent memory and can learn to navigate a new area or location quickly. Docket No. 280-1, pp. 3-4.

Thus, his allegations that TDOC failed to provide orientation and mobility training fail. Finally, it is undisputed that BCCX has offered and provided Tarvin with other accommodations such as electronic books, private showers, and handicap cells. If Tarvin requests a particular electronic book, assuming it is appropriate, BCCX has offered to order it for him. Id. at p. 3.

The undersigned concludes no genuine issue of material of fact exists. The evidence demonstrates TDOC has reasonably accommodated Tarvin or offered to do so, and therefore his ADA and Rehabilitation Act claims fail.

### 4. Count V - Denial-of-Access-to-the-Courts against CoreCivic and TDOC

In Count V, Tarvin asserts defendants[4] denied him access to the courts by interfering with his court mail and retaliating against him in violation of his First and Fourteenth Amendment rights. *Id.* Docket No. 224, at pp. 25-27. He alleges prison officials retaliated against him on at least five occasions after he filed his original complaint and obtained court-appointed counsel. Id. He alleges CoreCivic hindered his communication with counsel, retaliated against him by impounding his mail, tampered with his mail by falsely stamping it as "inmate refused," and eavesdropped on privileged communications with counsel. *Id.* He alleges these actions occurred only after he exercised his right to access the court. *Id.* He alleges these actions are part of a policy, custom, or practice on the part of defendants. *Id.* He contends the sheer number of these instances, as well as the context and timelines surrounding them, raise the reasonable inference that they were part of a policy, practice, or custom to gain strategic advantage and retaliate against him. *Id.*

The Supreme Court has recognized a constitutional right of access to the courts, whereby a plaintiff with a nonfrivolous legal claim has the right to bring that claim to a court of law. See *Christopher v. Harbury*, 536 U.S. 403, 415 n. 12 (2002) (collecting cases). To establish a denial-of-access-to-the-courts claim, a plaintiff must prove (1) a non-frivolous underlying claim, (2) obstructive actions by state actors; (3) "substantial prejudice" to the underlying claim; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable. *Flagg v. City of Detroit*, 715 F. 3d 165, 174 (6th Cir. 2013) (citing *Christopher*, 536 U.S. at 415). A plaintiff must show "actual injury" by alleging his nonfrivolous underlying claims suffered substantial prejudice. *Harbin-Bey v. Rutter*, 420 F. 3d 571, 578 (6th

---

[4] Tarvin directs this count to BCCX warden Cobble in his official capacity for declaratory and injunctive relief only, not damages. Docket No. 211.

Cir. 2005). When suing a governmental entity for constitutional violations under § 1983 a plaintiff must prove that the deprivation occurred pursuant to the entity's policy or custom. *See Meyers v. City of Cincinnati,* 14 F. 3d 1115, 1117 (6th Cir. 1994).

The evidence clearly demonstrates Tarvin had meaningful access to the courts while at SCCF and HCCF. Tarvin testified that while at both facilities he was able to file a lawsuit, draft letters or court filings by himself or have another inmate do it for him and send and receive mail without issue. Docket No. 286-2, at pp. 31-46. He testified he had no issues concerning access to his counsel while at HCCF or SCCF, had several phone and video calls with his counsel, and met in-person with counsel on one occasion. Id. at pp. 22-24. Tarvin testified that he was "able to voice [his] … opinion and [his] story" to the court. Id. at p. 37.

Tarvin asserts that staff at HCCF and SCCF listened during his attorney-client calls and meetings and was "pretty sure" they could hear. Docket No. 286-2, at pp. 35-36. Tarvin fails to establish "substantial prejudice," however. *Flagg*, 715 F. 3d at 174. Tarvin's counsel was able to successfully litigate his case, and he fails to demonstrate any injury or prejudice caused by any alleged breach of attorney-client privilege. Finally, CoreCivic presented evidence from warden Perry demonstrating that it has implemented policies ensuring inmates have access to courts and that its officers are trained on those policies. Because Tarvin has failed to set forth evidence to establish a prima facie case, the undersigned recommends defendants be granted summary judgment on his claim that defendants denied him access to the courts.

### 5. First Amendment Retaliation Claim Against CoreCivic and Phillips

To establish a prima facie case for First Amendment retaliation, a plaintiff must show: (1) that he engaged in constitutionally protected speech or conduct; (2) that the defendant took adverse action against him "that would deter a person of ordinary firmness from engaging in that conduct";

28

and (3) that the protected conduct caused the adverse action, at least in part. *Thaddeus-X v. Blatter*, 175 F. 3d 378, 394 (6th Cir. 1999) (en banc). Nonetheless, [i]f the plaintiff establishes a prima facie case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Wenk v. O'Reilly*, 783 F. 3d 585, 593 (6th Cir 2015)(cleaned up). Like any alleged constitutional violation by a government entity, a plaintiff must prove an unconstitutional policy or custom was the moving force behind a constitutional deprivation. *Monell v. Dept. of Soc. Srvs.*, 436 U.S. 658 694 (1978).

Tarvin has failed to establish the second element for a prima facie case; that defendants took adverse action against him. As detailed above, Tarvin testified that his access to this court has not been hindered and he has been able to file grievances at all relevant times. Tarvin has presented no evidence in support of his allegation that CoreCivic employees took any action against him in retaliation for filing a lawsuit. Nor can he show a policy or custom of retaliation necessary to prove a *Monell* claim against CoreCivic. Accordingly, CoreCivic should be granted summary judgment on Tarvin's claim for retaliation.

### III. CONCLUSION

Consistent with the above, the undersigned recommends defendants TDOC and CoreCivic's motions for summary judgment (Docket Nos. 280, 286) be **GRANTED** in their entirety and this action be dismissed.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report

and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**